UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| MARK EDER § | |
| Plaintiff, § | |
| § | CIVIL ACTION NO. 3:23-CV-00948 |
| VS. § | |
| § | |
| CITY OF BURLESON, § | |
| Defendant § | |

## PLAINTIFF MARK EDER'S ORIGINAL COMPLAINT

Plaintiff Mark Eder, by his attorney, files this his Original Complaint against Defendant City of Burleson, alleging as follows:

### I. JURISDICTION AND VENUE

1. This action arises Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2 (Title VII) and Chapter 21 of the Texas Labor Code, and the Federal False Claims Act (31 U.S.C. § 3730(h)(1)). Title VII and the Texas Labor Code each require administrative exhaustion, and Eder filed a joint charge of sex and religion discrimination with the EEOC and the Texas Workforce Commission. Eder has received his Right to Sue Letter from the EEOC and must file his Title VII claim by today. Eder had requested his Right to Sue Letter from the Texas Workforce Commission on multiple occasions, so far to no avail. Eder's state-based claims will thus automatically mature upon receipt of the state Right to Sue letter. Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a) (b). The Court has or will have supplemental jurisdiction over the Plaintiff's Texas Labor Code claims pursuant to 28 U.S.C. §§ 1367(a).

2. This Court has personal jurisdiction over Defendant as it is a municipality located within Johnson and Tarrant Counties within this District.

3. Venue is appropriate in the Northern District of Texas pursuant to 28 U.S.C. Section 1931(b)(2), and this matter is properly in the Dallas Division, because the acts or omissions that form the basis of this action occurred within the portion of the City of Burleson, Texas located in Johnson County, which is within the Dallas Division of the Northern District of Texas.

## II.   THE PARTIES

4. Plaintiff **MARK EDER** ("Eder") is a former employee of the Defendant and is a citizen of the United States and of the State of Texas.

5. Defendant **CITY OF BURLESON** is a Texas municipality. It may be served through its Mayor, Chris Fletcher or its City Manager, Brayn Langley, at:

> City of Burleson – City Hall
> 141 W. Renfro Street
> Burleson, TX 76028-4296

## III.   THE FACTUAL BACKGROUND OF THE ACTION

6. The evidence in this case will show that Plaintiff Mark Eder was terminated from his long-term position as Director of Information Technology in whole or part for one or more unlawful reasons. The evidence will show that he was fired in whole or in part (a) in violation of his right to the free expression of religion and/or based on sex (a cisgendered male) because he had the audacity to go to church, which falsely led the City of Burleson to terminate him for alleged LBGTQ termination when none occurred; or (b) because just weeks prior to his termination he opposed the unlawful procurement without proper bidding of a $160,000+ contract using what he believed to be federal American Rescue Plan Act (ARPA) funds that were being unlawfully awarded, in violation of state and federal law, without a competitive bid. In order to terminate Eder, the City concocted a pretext, and falsely accused Eder of discrimination

based on a pair of incredible misunderstandings that were only allowed to exist because the City refused to engage in a proper and non-pretextual investigation.

### A. Eder Had an Excellent Career Culminating as Director of Information Technology

7. Mark Eder was wrongfully terminated by Defendant Burleson after a superior 17+ year career at the Defendant. Eder began working for Burleson in August of 2004 as Director of Information Technology. Eder's tenure at Burleson was overwhelmingly positive, and included many raises, recognitions, awards, and regular positive feedback from his coworkers, supervisors, and clients. In fact, during the first 15 years of his long employment, he had no write-ups or negative annual reviews.

8. That all changed when Bryan Langley was hired as the new City Manager. Langley arrived from the City of Denton with a take charge and get rid of everybody attitude. Indeed, when Langley arrived, he asked Eder to clear out the IT department, stated that as the City grew its requirements would need to grow, and that it needed to change its way of doing business. Amazingly, Langley has now announced his intent to leave his position as City Manager after approximately four years of service as one-man wrecking crew.

9. One of the items that Langley required was the use of employment documentation as an aggressive means of setting people up for false termination. Accordingly, the use of PIPS and other employment processes that were more concerned about the process than about the truth of the results of the process were implemented.

### B. Eder Did Not Make Any LGTBQ Statements in 2019.

10. In 2019 as Director of IT, Eder supervised an employee whose initials are JR. Indeed, JR had worked for Eder in IT and had been promoted to a new position that required him to become Microsoft MCSE certified. However, JR had failed the test on the first two or more

attempts. After this occurred, JR was placed on a Performance Improvement Plan (PIP), and JR was reassigned by Human Resources to another supervisor, the Deputy City Manager.

11. Once placed on the PIP, JR realized that he was likely to be terminated. So, in an effort to protect his career, JR filed a large volume of baseless complaints with HR. One of those complaints falsely alleged that, over seven years prior in 2011, Eder had made an alleged anti-LGBTQ statement. When JR made these complaints, the City hired Julia Gannaway to investigate these complaints.

12. It seems that at some time in 2011, an employee came into Eder's office and asked for a specific electrician's tool. The tools were in the tool closet, and the tool closet was down the hall to the left of Eder's office. Accordingly, Eder told the employee that the tool was down the hall and pointed toward the tool closet.

13. Importantly, the tool that the employee was looking for was an electricians' tool that looks like a pair of pliers and is used to cut wire when installing electrical appliances or splicing wires. The tool is more formally referred to in electrician's catalogs as "diagonal pliers." However, the most common term used through the IT and electrical industry for this pair of pliers is a "pair of dikes," and if one does a google search for "pair of dikes," one will be directed to places selling "diagonal wire cutting pliers and/or "dikes."

14. Coincidentally, also down the hall and to the left of Eder's office were the offices of a lesbian employee of the IT department whose initials are "CJ."

15. Accordingly, in 2011, an employee came into Eder's office, asked Eder if he knew where the "pair of dikes" were. Because they were in the tool closet, Eder pointed to the tool closet and said the dikes were down the hall.

16. Despite the fact that there is a similar and derogatory term to describe lesbian persons, Eder's truthful statement that the diagonal pliers were located in the tool closet was not an anti-LGBTQ statement, and it had nothing to do with the fact that CJ was a lesbian. That CJ's office is near the tool closet and that the electrician's tool commonly referred to as a pair of dikes were in that tool closet are a mere coincidence.

17. In 2019, when the alleged investigation occurred, CJ was still working with the City in the IT Department and was still directly supervised by Eder. Indeed, in this matter CJ will testify that Eder was not anti-LGBTQ, that she had no idea why Eder was terminated when she was told he was, and that she was shocked when found out that Eder was terminated.

18. Upon information and belief, CJ was never asked any questions related to Eder's treatment of her that would have been exculpatory or otherwise cleared Eder of wrongdoing. Even so, based on a negligent Julia Gannaway investigation, Eder received a PIP allegedly because the diagonal pliers statement was an anti-LGBTQ statement.

**C.    Eder Opposes Misuse of City Funds Believed to BE From a Federal Source**

19. On or about early September 2021, Eder received his annual review from Langley. In this review, he received his best review and best grades ever from Langley.

20. The American Rescue Plan Act ("ARPA") was passed in March of 2021. It provided federal funds to a variety of state, municipal, and local governmental entities to combat the economic effects of the COVID-19. Among these funds were funds that can be used for public safety, including public safety software and IT uses. However, when one applies for ARPA funds, the application requires a statement that the funds will be used appropriately and in accordance with all appropriate bidding laws.

21. In September of 2021, the City of Burleson had approximately $11 million dollars in unused ARPA funds. If these funds were not timely used, then the City has to return the funds.

22. The use of federal ARPA funds was highly regulated, and the City of Burleson was profoundly aware of the restrictions and requirements related to ARPA funds. The funds can only be used for specific purposes and the funds must be properly documented. ARPA funds are subject to federal procurement requirements outlined in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), found at Title 2 of the Code of Federal Regulations, Part 200 ("2 CFR 200").

23. During the week of September 23rd, 2021, Eder became aware that Langley had placed an approximately $160,000+ consulting contract using funds from an IT account under Eder's supervision on the City Council agenda. However, Langley had never discussed this contract with Eder, and Langley had never informed Eder that he was going to use IT funds for such a use. The City Council agenda item was placed on the agenda by the City's Public Safety Communications Manager.

24. The City's budget process is usually a long-term process. The IT Department has what can be described as an internal service fund, meaning that sometimes funds would pay for IT services from the budgetary accounts of the department that was receiving services. In such cases, the funds would be routed through an IT internal services account for accounting purposes. This is important because Eder was fully aware that the IT Department did not have over $160,000 in unallocated funds just sitting on the shelf for the purposes of an IT Consulting contract. Accordingly, Eder reasonably assumed that these funds were likely ARPA funds.

25. Moreover, under state laws, any such contract for over $50,000 has to be subjected to proper and public bidding processes. So, the failure to do a no-bid contract for this $160,000

consulting contract violated state law, and also ARPA <u>if</u> the City was using ARPA funds as Eder assumed at the time.

26. Accordingly, Eder contacted the Deputy City Manager to schedule a chance to talk with Langley. However, Langley was out of town on a personal vacation trip. Thereafter, Eder spoke with the Purchasing Manager and the Deputy City Attorney to determine what this City Council agenda item was and where the money was coming from and questioning the procurement process and how a contract this large was being sent to Council without required competitive bidding and without Eder's prior knowledge as the IT Director.

27. Eder was told that the money was to secure a consulting contract and that Langley was "hot" that the contract be on the agenda.

28. Eder opposed the contract being on the Council agenda because under state law a bid was required, and Eder asked both Purchasing Manager and the Deputy City Attorney where the funds were coming from. This was because if the funds were ARPA funds, it would also violate the City's federal application for such funds. Given that the use of ARPA funds was well known to be surrounded by regulatory requirements, Eder's questions and conduct opposing the no bid approval process would have identified to the persons he spoke with that he feared the misuse of federal ARPA funds.

29. Despite Eder's opposition, Langley pushed through the item and the $160,000+ contract was approved by the City Council.

30. Upon information and belief, the City used federal ARPA funds in violation of ARPA requirements and/or the express representation it made to the federal government to obtain such funds. Further, given Eder's multiple conversations in opposition to the no bid contract and the positional closeness of the Purchasing Manager and the Deputy City Attorney persons, upon

information and belief, Langley was aware that Eder opposed the contract, including because it violated state and federal law and ARPA requirements.

### D. Eder Did Not Make any Anti-LGTBQ or Anti-Asian Statements in 2021

31. Subsequently, in late September of 2021, another alleged investigation occurred after another disgruntled subordinate made a plethora of complaints in a vain effort to avoid responsibility for his own employment conduct.

32. Specifically, Eder as IT Director had an employee whose performance had dropped. This employee's first name was "Charley." Charley was the Deputy Director of IT. Charley and JR were close friends, and Charley was aware of JR's prior use of the complaints in an attempt to save his job.

33. Charley and Eder were supposed to take an online training class. Continuing education was a requirement of employment, and Charley and Eder were taking the same class.

34. On the Sunday prior to the class beginning on Monday, Charley sent multiple text messages stating that he wanted to take the class remotely. Eder saw the messages and called Charley. In that discussion, Charley was drunk and profane. Charley apologized for this conduct the next day.

35. Also during that same week, while Charley was taking the class remotely and not in the office, Eder had reorganized the schedule of an employee named Scott who took off early on Thursday, so he could attend a meeting on Friday, which was otherwise Scott's day off.

36. On Friday, Charley found that Scott had worked that Friday by attending this meeting without Charley's prior knowledge or permission. Charley was unaware both that Eder had sent Scott home early to avoid the necessity for overtime pay for working on Friday and that this work arrangement was expressly conducted at the request of Scott who wanted to attend a City

meeting that Friday. In the absence of such knowledge, Charley was already angry when he called Eder about Scott working on a Friday. In that discussion, although sober, Charley was again profane and insubordinate, cussing out Eder (his boss) for rearranging Scott's schedule without Charley's prior approval. Accordingly, with two such profane and insubordinate events in a short timeframe. Eder decided to write up Charley.

37. Instead of accepting the write up, however, Charley followed JR's prior path and entered into an attempt to get Eder fired by making false accusations against Eder that Eder had a made anti-LGTBQ and Anti-Asian comments.

38. In the investigation, it was alleged that Eder made three allegedly anti-Gay statements:

   a. That all gay people go to hell, or words to that effect. Eder made no such statement, and if a proper investigation had occurred, the City would have known it.

   b. That Eder made a joke about "how two lesbians would build a house." The joke need not be written in print. However, Eder never told the joke and had never heard it until Julia Gannaway told it to him.

   c. That in relation to an individual seeking employment at the City, who at the time had been a Police Officer and worked in a Sherriff's Office IT department, that Eder stated, "did you know [he] is gay." Again, this allegation was false. The alleged conversation occurred in San Antonio with two other Burleson employees while attending a meeting on behalf of the City. However, the statement was not made by Eder. Rather, one of these other employees asked if the other two (Eder and the HR professional) knew that the individual in question "was gay?" Eder responded that he neither knew nor cared. Even more, with this knowledge that the

    individual was gay, Eder subsequently hired him to work for him in the IT Department at the City of Burleson in the job for which he was applying. This individual was still employed by the City when Eder was forced to resign.

  d. In deciding to terminate Eder, the City did so claiming that he had made the above mentioned lesbian joke, but it did not mention the other two alleged allegations were also part of Julia Gannaway's investigation.

  39. Within the investigation, Eder also was asked questions about false allegations of anti-Asian statements. Specifically, Eder was alleged to have "mocked" an Asian employee that he had hired by alleged mocked bowing and alleged mocking of the employee's Asian accent. This too is false.

  40. To the contrary, after receiving numerous concerns about working with the newly hired Asian worker (who did have a thick Asian accent and who was culturally Asian in outlook and conduct), Eder asked this employee's co-workers to respect and be sensitive to the employee's Asian heritage. Eder explained that the employee's accent and cultural traits might be different than the team members other co-workers, but that she was a good employee and that he wanted everyone in the IT department to treat her with the utmost sensitivity. The idea that in doing so, Eder is forbidden to identify the Asian accent or cultural issues, is preposterous. The idea that in seeking to show and seek respect for an Asian subordinate that he is accused of being "anti-Asian" is not just preposterous, it is downright Orwellian and right out of the novel "1984."

  41. Following the investigation, Eder was forced to either resign or be fired. Given this Hobson's choice, Eder's forced resignation was a constructive discharge because an employee who "resigns after the employer communicates that the employee will be fired" has been constructively discharged. See, *Parker v. Pulte Homes of Tex., L.P.,* No. H–09–2743, 2011 WL

767182, at *11 (S.D. Tex. Feb. 25, 2011) citing *EEOC v. Univ. of Chi. Hosp.,* 276 F.3d 326, 332 (7th Cir. 2002); *and also Spulak v. K Mart Corp.,* 894 F.2d 1150, 1154 (10th Cir. 1990).

**E.    The City of Burleson Knew or Should Have Known that Julia Gannaway is Not an Impartial Investigator**

42.    In determining to terminate Eder, the City claimed to rely on outside counsel Julia Gannaway of the law firm of Ross Gannaway, PLLC.

43.    Langley and Gannaway have combined in the past to circumvent employment law rights of municipal employees. Specifically, in the matter of *Grim v. City of Denton*, a Dallas County district court jury implicitly found that the investigation done by Gannaway and Langley was a sham investigation and that the real reason that Denton's former employees Jim Maynard and Michael Grim were terminated was that they had blown the whistle on a City Council member who had violated Texas law by publishing protected and confidential bidding data on a set of multi-million dollar utility building and consulting contracts.

44.    In that January and February 2020 jury trial, the jury returned a $3.9 million verdict for the employees despite the testimony of Langley that he had fired these employees following a Julia Gannaway investigation because the results of the Gannaway investigation made Langley no longer trust the employees involved.

45.    However, after listening to the audio tape interviews by Gannaway and Langley of the Grim and Maynard in that matter, the jury found that the Gannaway and Langley interviews were a sham to create a pretext and that the real reason for these plaintiffs' termination was their whistleblowing activity.

46.    Indeed, in that case, Gannaway had allowed her investigation to be controlled by the City of Denton. Instead of contacting key witnesses who could provide necessary background,

Gannaway limited her investigation to the witnesses directed by the City and refused to obtain exculpatory information related to the employees she was allegedly investigating.

47. In the 2020 Denton trial, Langley was a central witness and was cross-examined in front of the jury about the nature of his employment investigation with Gannaway and the fact that it appeared that he and Gannaway had a pre-conceived notion to use the investigation to entrap the employees and find an excuse for the pre-determined decision to terminate them.

48. It is amazing that despite having subjected Denton to such a jury verdict in 2020, that Langley and Gannaway would engage in almost identical conduct in 2021 against Eder. Indeed, in this matter Gannaway failed or refused to take into account the possible improper motives of others related to the employees in that matter. Gannaway had a mission. That mission did not include completing a thorough or proper investigation. That mission did not include finding the truth.

49. Given that the City is relying on the Gannaway investigations, under federal case law, the attorney-client privilege between Gannaway and the City has been waived because when an employer uses an attorney investigation as the basis for its termination of an employee, most, if not all, of the investigation loses its attorney-client privilege under the offensive use doctrine. *See, e.g., Walker v. Contra Costa County*, 227 F.R.D. 529, 533-34 (N.D. Cal. 2005).

50. Upon information and belief, when all of Ganaway's notes, audiotaped witness interviews, and communications between Gannaway and the City (especially with the City Manager Langley), it will be clear that the Gannaway investigation in this case was also a sham to perpetrate a pretextual termination and that the real reason for Eder's termination was unlawful for one or more of Eder's alleged causes of action.

**IV.   LEGAL BACKGROUND FOR FALSE CLAIMS ACT WHISTLEBLOWING**

51. Known as "Lincoln's Law," the False Claims Act (FCA) was enacted during the Civil War to counter widespread fraud by contractors supplying the military. The FCA provides robust protection against retaliation. Specifically, at 31 U.S.C. Section 3730(h)(1), the FCA provides:

> Any employee, … shall be entitled to all relief …, if that employee, … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against …, because of lawful acts done by the employee … in furtherance of … efforts to stop 1 or more violations of this subchapter.
>
> *See* 31 U.S.C. § 3730(h)(1). (emphasis added by removal of superfluous language).

52. Unlike a False Claims Act where the individual seeks a recovery on behalf of the United States by filing a Qui Tam Action (which is a claim made pursuant to 31 U.S.C. § 3729 through the procedural requirements of §3730 (b)), a claim made pursuant to Section 3730(h) (2) of the False Claims Act is a claim for unlawful retaliation, including wrongful termination.

53. The purpose of Section 3730(h) (2) of the False Claims Act is to prevent the need for a False Claims Act Qui Tam action by creating whistleblower protections to establish the conditions where false claims are less likely to occur. Accordingly, there is no administrative prerequisite for filing a claim with the United States government. *See, e.g., Tibor v. Michigan Orthopedic Institute*, 72 F.Supp.3d 750, 756-57 (E.D. MI 2014).

54. As the D.C. Circuit has held:

> To come within § 3730(h), an employee does not have to alert his employer to the prospect of a False Claims Act suit. …. The employee has no obligation to give such a warning because § 3730(h) does not require the employee to " 'know' that the investigation he was pursuing could lead to a False Claims Act suit." … In terms of § 3730(h), an employee can be acting "in furtherance of an action under this section"—can be engaging in protected activity—although the employee is not contemplating bringing a *qui tam* suit, is not even aware that there is such a thing as a *qui tam* action, and has no idea whether his—the employee's—investigation or other acts, if made known to the government, might cause the Attorney General to sue his employer under the False Claims Act. From this, it follows that the employer

may incur liability under § 3730(h) even if the employer has no inkling that a False Claims Act suit may be in the offing.

*U.S. ex. rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012) (citations omitted).

55. The Fifth Circuit recognizes internal complaints that "concern false or fraudulent claims for payment submitted to the government" as protected activity under the FCA but requires that the complaints in question raise concerns about fraud. *See Patton*, 418 Fed.Appx. at 372 (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir.1994)). The Southern District of Texas has clarified that the FCA anti-retaliation whistleblower provision can be triggered "by making internal reports that alert the employer to fraudulent or illegal conduct." *U.S. ex. Rel George*, 864 F. Supp 2d 597, 606 (S.D. Tex. 2012), citing *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

56. The FCA's scope of protection against retaliation is generally governed by the "distinct possibility" standard under which the "employee need not 'have filed an FCA lawsuit or ... have developed a winning claim at the time of the alleged retaliation.'" *See Miniex v. Houston Housing Authority*, 400 F.Supp.3d 620, 640-41 (S.D. Texas), citing *U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 604-05 (S.D. Tex. 2012) (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.,* 360 F.3d 220, 236 (1st Cir. 2004)).

57. Accordingly, for a state employee to satisfy this standard, the employee's actions must be motivated by a "good faith" and objectively reasonable belief—i.e., "a reasonable employee in the same or similar circumstances might believe"—that her "employer is committing fraud against the [federal] government." *See id.* at 605. *See also Thomas v. ITT Educ. Servs., Inc.*, 517 Fed.App'x 259, 263 (5th Cir. 2013) (per curiam) ("A protected activity is one motivated by a concern regarding fraud against the [federal] government.").

58. A state governmental entity acting as an employer may be sued directly under the FCA related to its misuse of federal funds. *See, e.g., Miniex v. City of Houston*, 400 F.Supp.3d 620 (S.D. Tex. 2019).

59. In such a matter, the [former] employee of a state agency states a valid FCA whistleblower claim if he or she has "a good faith and objectively reasonable belief that staff at [the employee's state agency] could be continuing to commit fraud by misdirecting federal funds." *See id.* at 641.

60. As the Southern District of Texas stated, the FCA anti-retaliation provision can be triggered "by making internal reports that alert the employer to fraudulent or illegal conduct." *U.S. ex. Rel George*, 864 F. Supp 2d 597, 606 (S.D. Tex. 2012), citing *U.S. ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1304 (11th Cir. 2010).

61. In order to state a prima facie claim of retaliation under 31 U.S.C. § 3730(h), Plaintiff must show that the employee:

1) engaged in "protected activity" under the statute;

2) Defendant knew that the employee engaged in the protected activity; and

3) Defendant discharged or otherwise discriminated against her because of the protected activity.

*Thomas v. ITT Educ. Svs., Inc.,* 517 Fed.Appx. 259, 262 (5th Cir.2013).

62. Under Section 3730(h) (2) of the False Claims Act, relief for a wrongfully terminated employee may include:

- Reinstatement;
- Double back pay; and
- Compensation for any special damages including litigation costs and reasonable attorneys' fees.

## V.   CLAIMS FOR RELIEF

63. Under the Federal False Claims Act, Title VII, and/or the Texas Labor Code, an employee can be terminated for more than one reason, and an employee can prove wrongful termination if any of the reasons were illegal and the termination would not have occurred without one or more illegal reason[s].

### FIRST CLAIM FOR RELIEF
### (WRONGFUL TERMINATION BECAUSE OF RELIGION IN VIOLATION OF TITLE VII AND/OR THE TEXAS LABOR CODE)

64. Plaintiff realleges each allegation set forth in the paragraphs above.

65. By reason of the foregoing, Defendant City of Burleson violated Title VII and/or Chapter 21 of the Texas Labor Code by terminating Eder, in whole or in part, because of religion. Indeed, among other unlawful items, the City improperly assumed that merely because Eder regularly attended church services and was active in his congregation, that he must harbor anti-LGBTQ animus, which is a false and pretextual assumption based on stereotype. Indeed, Eder's congregation is a welcoming congregation and Eder has no anti-gay animus.

66. Eder has been injured by his wrongful termination and as a result should receive compensatory legal damages and equitable remedies, including but not limited to equitable reinstatement with backpay; mental anguish; loss of enjoyment life; the loss of benefits in the past and in the future; punitive damages; necessary and other compensatory damages or equitable relief that the Court finds just and/or right.

### SECOND CLAIM FOR RELIEF
### (WRONGFUL TERMINATION BECAUSE OF SEX IN VIOLATION OF TITLE VII and/or TEXAS LABOR CODE)

67. Plaintiff realleges each allegation set forth in the paragraphs above.

68. By reason of the foregoing, Defendant City of Burleson wrongfully terminated Eder and violated the Title VII and/or Chapter 21 of the Texas Labor Code by terminating him in whole

or in part because of his sex – cisgendered male. Indeed, part of the reason the City so easily believed the false statements against him and used them as a pretext for his termination was the false bias and negative stereotype that a cisgendered male person like Eder believed such items against his lesbian subordinates.

69. Eder has been injured by his wrongful termination and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: back pay; equitable reinstatement, if feasible, or front pay; mental anguish; loss of enjoyment life; the loss of benefits in the past and in the future; punitive damages under Title VII and/or the Texas Labor Code; and other compensatory damages or equitable relief that the Court finds just and/or right.

### THIRD CLAIM FOR RELIEF
### (WRONGFUL TERMINATION UNDER THE FEDERAL FALSE CLAIMS ACT IN RETALIATION FOR OPPOSING FEDERAL FUNDINGS FRAUD)

70. Plaintiff realleges each allegation set forth in the paragraphs above.

71. By reason of the foregoing, Defendant City of Burleson wrongfully terminated Eder in violation of the federal False Claims Act by terminating him in whole or in part because Eder opposed the City of Burleson committing federal funding fraud by violating the required and promised terms and conditions pledged by the City to obtain millions of dollars in ARPA funding.

72. Eder has been injured by his wrongful termination and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: back pay; double back pay; equitable reinstatement, if feasible, or front pay; and other compensatory damages or equitable relief that the Court finds just and/or right.

### VI.   JURY DEMAND

73. Although the Plaintiff seeks an equitable injunction of reinstatement or equitable front pay in the alternative, even cases with remedies sounding in equity, to the extent there are

one or more issues of fact or law suitable for a jury, the Plaintiff respectfully requests a jury trial on all such issues.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Mark Eder seeks relief against Defendants, as follows:

A. That this matter be submitted to a trial by jury on all legal issues and as a bench trial for all issues of equity, and that Judgment be entered against all Defendants:

    a. Finding that that Defendant violated Title VII and/or the Texas Labor Code at Chapter 21 by terminating his employment, in whole or in part, because of religion and/or in retaliation for protected religious expression;

    b. Finding that that Defendant violated Title VII and/or the Texas Labor Code at Chapter 21 by terminating his employment, in whole or in part, because of sex;

    c. Finding that that Defendant violated the Federal False Claims Act by terminating his employment, in whole or in part, because of he opposed federal fraud in the form of the misuse of ARPA funds by requiring proper bidding procedures to be followed;

    d. Awarding direct financial damages and equitable relief, including back pay; equitable reinstatement or equitable front pay; loss benefits in the past and in the future; under Title VII, the Texas Labor Code, and/or the False Claims Act;

    e. Awarding liquidated damages in the form of double back pay under the False Claims Act;

    f. Awarding compensatory damages under Title VII, the Texas Labor Code, and or the False Claims Act for Plaintiff's out-of-pocket expenses and other foreseeable financial harm;

g. Awarding compensatory damages under Title VII, the Texas Labor Code, and/or the False Claims Act compensatory for Plaintiff's mental anguish, loss of enjoyment of life, suffering, and inconvenience;

h. Awarding punitive damages under Title VII and/or the Texas Labor Code; and/or

i. Awarding attorney fees; costs of court, and all such other and further relief in law or equity as the Court deems to be just and right.

RESPECTFULLY SUBMITTED,

*/s/ Eric N. Roberson*

---

Eric Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, TX 75219
214-379-0817 Direct
214.969.9099
214.379.0843 Fax
ENR@KilgoreLaw.com
**Attorney for Plaintiff Mark Eder**